IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

TIMOTHY F. MCGARRY,
     Petitioner,

vs.                           Case No.:  5:12cv202/MMP/EMT

MICHAEL D. CREWS,
     Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's second amended petition for writ of habeas corpus and supporting memorandum, filed pursuant to 28 U.S.C. § 2254 (docs. 23, 25).  Respondent filed an answer and relevant portions of the state court record (docs. 37, 45, 46, 47).  Petitioner filed a reply (doc. 51).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2; *see also* 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* docs. 45, 46, 47).[1]  Petitioner was charged in the Circuit Court in and for Bay County, Florida, Case No. 2003-CF-1735, with three counts of lewd or lascivious battery (Ex. B at

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted by Respondent (docs. 45, 46, 47).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

223–24).  Following a jury trial, he was found guilty as charged (Ex. B at 244–45, Exs. C, D).  On August 6, 2004, Petitioner was sentenced to fifteen (15) years of imprisonment on Count 1, a consecutive term of fifteen (15) years of imprisonment on Count 2, and a term of ten (10) years of imprisonment on Count 3, to run consecutively to the sentences on Counts 1 and 2, with pre-sentence jail credit of 51 days (Ex. B at 305–13, Ex. F).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D04-3954 (Ex. I).  The First DCA affirmed the judgment per curiam without written opinion on December 16, 2005, with the mandate issuing January 4, 2006 (Ex. L). McGarry v. State, 918 So. 2d 296 (Fla. 1st DCA 2005) (Table).  Petitioner did not seek further review.

On March 8, 2007, Petitioner filed, through counsel, a motion for postconviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. M at 354–69).  The state circuit court dismissed some of Petitioner's claims and ordered an evidentiary hearing on others (Ex. O at 459–60, Ex. S at 1016–86).  In an order rendered July 21, 2011, the state circuit court denied the Rule 3.850 motion (Ex. V at 1089–1100).  Petitioner appealed the decision to the First DCA, Case No. 1D11-4444 (Ex. BB).  The First DCA affirmed the decision per curiam without written opinion on July 23, 2012, with the mandate issuing August 8, 2012 (Exs. DD, FF).  McGarry v. State, 93 So. 3d 1018 (Fla. 1st DCA 2012) (Table).

On July 22, 2012, Petitioner filed a petition for writ of habeas corpus in the state circuit court where he was then confined (Ex. GG at 17–24).  The court transferred the case to the circuit court where Petitioner's judgment of conviction was entered (id. at 3–5).  The circuit court summarily denied the petition (id. at 53–54).  Petitioner appealed the decision to the First DCA, Case No. 1D12-5076 (Ex. HH).  The First DCA affirmed the decision per curiam without opinion, with the mandate issuing July 9, 2013 (Ex. JJ).  McGarry v. State, No. 1D12-5076, 2013 WL 1859069 (Fla.1st DCA May 3, 2013) (Table).

Petitioner filed the instant federal habeas action on June 24, 2012 (doc. 1 at 17).

II.    TRIAL EVIDENCE

S.M. was fourteen (14) years old at the time she testified at trial in June of 2004 (Ex. T at 46). She testified Petitioner was married to her older sister Lisa, until July of 2002, when Lisa and

Petitioner separated (*id.* at 46–49).  S.M. testified she had a "crush" on Petitioner throughout his marriage to her sister, and Petitioner and "everybody" knew about her crush (*id.* at 49).  She testified Petitioner was living in a house on South Lagoon Street in Panama City Beach when Petitioner and Lisa separated (*id.* at 49–50).  S.M. testified she spent a lot of time with Petitioner after he and Lisa separated (*id.* at 50).  She testified she often spent the night with him and helped him at work (*id.* at 50–51).  She testified that her parents, Mary and Mike Meints, gave her permission to do so (*id.* at 51).  S.M. testified that during that time, she and Petitioner began flirting with each other and then had a sexual relationship (*id.*).  She testified the first time they had sexual contact, they were both sitting in a recliner watching a movie at his house on South Lagoon (*id.* at 51–52).  She testified Petitioner told her he wished she was older, because then he could ask her to go on a date (*id.* at 52).  S.M. testified that later in the evening, Petitioner stated it was time for them to go to bed, and he told her she could go into his room if she wished (*id.*).  S.M. testified they went into his bedroom and laid on the bed (*id.*).  She testified he started touching her and putting her hand on his private parts, and then he started kissing her (*id.*).  She testified he told her he loved her (*id.*).  S.M. testified that after that night, they continued to kiss and touch (*id.* at 53).  She testified that one evening later that month, they were lying on his bed in his bedroom, kissing and touching, and Petitioner asked her if she wanted to have sex, and if she wanted him to be her "first time" (*id.*).  S.M. testified he asked her if he would need to use a condom, and she told him yes (*id.*).  She testified she went into the bathroom and removed her clothes, and then returned to the bed (*id.*).  She testified Petitioner had removed his clothes and put on a condom (*id.* at 53–54).  S.M. testified Petitioner pulled her on top of him, but she was uncomfortable, so he told her to lie on her back (*id.* at 54).  S.M. testified she spread her legs, and Petitioner got on top of her and stuck is penis in her vagina, and they had sex (*id.* at 54–55).  She testified it hurt a little bit at first, but then she got used to it and was okay (*id.* at 55).  S.M. testified that while they had sex, Petitioner was breathing heavily and asking her if she was okay (*id.*).  She testified she believed Petitioner loved her (*id.*).  S.M. testified she did not tell anyone about their sexual relationship, because Petitioner told her they would both get in trouble, and he could go to jail (*id.* at 55–56).

S.M. testified that the next month, in August of 2002, Petitioner's son and daughter (Justin and Nicole McGarry) visited Petitioner at the same house on South Lagoon Street (Ex. T at 56).  She

testified Nicole was in her room with the door closed, and Justin was in his room playing video games with the door cracked (*id.*). She testified Petitioner told her to sneak into his room later that night, so she did (*id.*). She testified she and Petitioner were lying on his bed talking, and he said he wanted to give her oral sex (*id.*). S.M. testified he tried to take her underwear off, but she would not let him (*id.*). She testified Petitioner reassured her, so she spread her legs and he removed her underwear (*id.* at 56–57). She testified Petitioner put his face between her legs and put his mouth around her vagina and performed oral sex on her (*id.* at 57). She testified that a few minutes later, she heard Justin and Nicole talking outside Petitioner's bedroom (*id.*). She testified Nicole had just come out of the bathroom, and Justin said he did not know where S.M. was, so Justin and Nicole knocked on the bedroom door (*id.*). S.M. testified Petitioner told her to go into his bathroom, and he told Nicole and Justin that S.M. was in his bathroom because she had to use the bathroom (*id.*). S.M. testified she still did not tell anyone about their sexual relationship, because she thought they were having a "real relationship" (*id.* at 57–58).

S.M. testified that in September of 2002, Petitioner moved to another house, on Oak Brook Lane (Ex. T at 58). She testified she spent the night at his house, and they were lying on his bed watching television and had intercourse, meaning, he put his penis in her vagina (*id.* at 59). She testified she performed oral sex on him, meaning, she put her mouth around his penis (*id.*). She testified during this time, Petitioner told her he loved her, and when she turned 18, they would get married and he would take her on a vacation (*id.* at 60). She testified she believed what he said, and she thought they were going to get married (*id.*).

S.M. testified that in early 2003, her parents, Mike and Mary Meints, became concerned about the amount of time she was spending with Petitioner and talking to him on the phone (Ex. T at 60). She testified that the three of them, as well as Kathy and Dennis Welsh, had a meeting, and her parents asked why she was always calling Petitioner and wanting to spend time with him (*id.* at 60–61). She testified they asked her if she loved him as a boyfriend, and she said no (*id.* at 61). S.M. testified that her parents took away her telephone and computer privileges and grounded her for approximately one month (*id.*). She also testified that at some point, she told one of her sisters about their relationship, and S.M. later told her mother (*id.*). She testified their sexual relationship was reported to the child protective services agency and law enforcement (*id.* at 61–63). S.M. testified that in June of 2003,

Investigator Mathis with the Sheriff's Office asked her if she would make a telephone call to Petitioner (*id.*). She testified she agreed, and the telephone call was recorded (*id.*). S.M. identified a cassette tape, and she testified that she had recently listened to the tape and it accurately reflected her conversation with Petitioner (*id.* at 63–64).

On cross-examination, S.M. testified that after the meeting with her parents, she still telephoned Petitioner from school (Ex. T at 69–70). She testified Andrea "Rae" Cowell was with her during some of those calls (*id.* at 70). S.M. testified that during the recorded conversation with Petitioner, Petitioner said, "deny it" (*id.* at 71). She testified that when she spent the night at Petitioner's house, sometimes her sister was there, sometimes Rae Cowell was there, and "only a few times" Nicole and Justin were there (*id.* at 77). She testified she would wait until the others were asleep, and go into Petitioner's bedroom (*id.* at 78). She testified Petitioner did not lock his bedroom door (*id.*).

Mary Meints testified she was S.M.'s mother and Lisa's (Petitioner's ex-wife) stepmother (Ex. T at 92–93). She testified Petitioner and Lisa lived on South Lagoon, but Lisa moved out in early July of 2002 (*id.* at 95). She testified after Petitioner and Lisa separated, they (Ms. Meints and her husband) still considered Petitioner a family member (*id.* at 96). She testified Petitioner came to their home a lot and spent a lot of time with S.M. (*id.*). She testified that in early August, Lisa stopped talking to her and her husband, because she was angry that they maintained a relationship with Petitioner (*id.*). Mary Meints testified that Petitioner's children visited him in early August of 2002, and S.M. spent the night at Petitioner's house while they were visiting (*id.* at 96–97). She testified S.M. also spent the night at Petitioner's house when he moved to a house on Oak Brook in September of 2002 (*id.* at 95, 97). Mary Meints testified she and her husband developed concerns about S.M.'s crush on Petitioner and the fact that S.M. wanted to spend a lot of time with him instead of her friends and family (*id.*). Meints testified that also around that time, in late January of 2003, there was a death in the family, and she told Lisa she wanted to reunite the family (*id.* at 97–98). Mary Meints testified it was difficult to reestablish a relationship with Lisa and still maintain a relationship with Petitioner, so she and her husband asked S.M. not to call Petitioner or spend time with him (*id.* at 98). Ms. Meints testified she and her husband discovered S.M. had been calling Petitioner despite their request that she not do so, so in late February of 2003, they called a family meeting and put S.M. on restriction

for approximately two months in March and April of 2003, meaning, they removed the telephone and disconnected the television from her bedroom, and she was not allowed to use the computer (*id.* at 99). Ms. Meints testified she discovered S.M.'s sexual involvement with Petitioner in late May of 2003 (*id.* at 99–100). She testified when she confronted S.M. about it, S.M. was embarrassed and crying (*id.* at 100). She testified she and her husband contacted authorities the next day (*id.*). Ms. Meints identified State's Exhibits 3, 4, 5, and 6 as photographs of her stepdaughters and S.M. (*id.* at 103–04). She identified Exhibit 3 as a photograph of the four girls, her three stepdaughters and S.M. (*id.*). She identified Exhibit 4 as a photograph of one of her stepdaughters and S.M. (*id.*). She identified Exhibits 5 and 6 as photographs of S.M. (*id.*).

On cross-examination, Mary Meints testified that she, S.M., Petitioner, and Petitioner's friend Brian Backus had dinner at Hamilton's Restaurant in November of 2002 (Ex. T at 106). She testified she was familiar with allegations that she grabbed Petitioner's butt as they were leaving the restaurant and then propositioned Petitioner (*id.* at 108–09). Ms. Meints testified she was familiar with the fact that in February of 2003, Petitioner told her husband, Mike, about her alleged behavior (*id.* at 109). She testified there was no connection between Petitioner's telling Mike about her alleged behavior and the confrontational meeting with S.M. when they punished her for having contact with Petitioner (*id.* at 110–14).

On re-direct examination, Mary Meints testified that the reason she wanted to end the family's relationship with Petitioner was because she believed Petitioner made the false allegations about her because he was upset that she was reestablishing a relationship with Lisa and her other step-daughter Meagan (Ex. T at 118–19). Ms. Meints testified that the reason she questioned S.M. in May of 2003 about a sexual relationship with Petitioner was that S.M.'s sister told her S.M. had talked to her, and based upon their conversation, she (the sister) thought S.M. may have had sexual contact with Petitioner (*id.* at 119).

Dr. Craig Tilman testified he had practiced in the area of obstetrics and gynecology for thirteen (13) years and was board certified (Ex. T at 120–21). He testified he routinely examined teenaged girls, including girls who were sexually active and girls who had allegedly been sexually abused (*id.* at 121–22). He testified he examined S.M. on July 15, 2003 (*id.* at 137). He testified he observed no obvious abnormalities (*id.* at 138). He testified generally there is no observable evidence of

sexual abuse unless the abuse occurred very recently, and sometimes even in those situations, there is no evidence of trauma (*id.*). He testified that even upon examining pregnant teenaged girls, when penetration of the vagina obviously occurred, there is no evidence of penetration (besides the pregnancy) unless the girl has a "very rare" physical condition where there is a window of skin over the vaginal opening (*id.* at 138–39). He testified that in his experience of examining girls who have been allegedly sexually abused, he found physical evidence of abuse in only one case, where he examined the patient within a few hours of being assaulted (*id.* at 141).

Investigator Jeremy Mathis testified that he investigated the allegations of sexual abuse of S.M. by Petitioner (Ex. T at 141–42). He testified he asked S.M. to make an "undercover call" to Petitioner, and she did so on June 2, 2003 (*id.* at 143–44). Investigator Mathis testified he instructed S.M. as follows:

> . . . I pretty much told [S.M.] that we didn't want to get into details, we didn't want her to try to make up an extravagant type story as to why she was calling him, we basically wanted her to say that her mother had been told what had been going [on] and see if he would reply to that.

(Ex. T at 144). Mathis identified the audiotape of the telephone call, and the tape was admitted into evidence with no objection from defense counsel (*id.* at 144–45). The tape, which was published to jury, included the following exchange between S.M. and Petitioner:

> [Petitioner]: Hello.
>
> [S.M.]: Hey.
>
> Petitioner: Hey.
>
> S.M.: What are you doing?
>
> Petitioner: Working.
>
> S.M.: You're working?
>
> Petitioner: Yep.
>
> . . . .
>
> S.M.: Oh, well, I kind of have a problem.
>
> Petitioner: What's that?

S.M.:  I came home from Kayla's yesterday and Meagan was crying, talking to Mom and Katie.  And then mom tells me she wants to talk to me.  About you.

Petitioner:  Yeah.

S.M.:  I think they know.

Petitioner:  What did you tell them?

S.M.:  No, I didn't tell them but I think Meagan did because remember that day?

Petitioner:  Okay.  Hey if you admit to anything.

S.M.:  No, I didn't say anything.

Petitioner:  You're sure hundred percent?

S.M.:  Yeah, I didn't say anything.

Petitioner:  Okay.

S.M.:  But I think that that one day you remember when—

Petitioner:  I don't know.

S.M.:  What am I supposed to say?

Petitioner:  Nothing.

S.M.:  But what I'm afraid [sic] she's going to ask me something and I don't know what to do.

Petitioner:  Nothing, nothing, nothing.

S.M.:  Just don't say anything, just deny it.

Petitioner:  Yeah.
. . . .
S.M.:  All right, well, I just didn't know what to do, it kind of freaked me out when she was, like, [I want to] talk to you about Tim and then Meagan running her mouth.

Petitioner:  Well, just deny it to the end.

S.M.:  All right.

Petitioner:  Okay, no matter what, deny it.

S.M.:  Okay.

Petitioner:  That way you can't get in trouble.

S.M.:  Tim?

Petitioner:  Yes.

S.M.:  Was any of that stuff that Meagan ever said true, was any of that true?

Petitioner:  No.

S.M.:  None of it?

Petitioner:  No.

S.M.:  All right, well, listen, I got to go, okay, 'cause Mom called like ten minutes ago and she said she was going to run an errand, then she was going to pick me up.

Petitioner:  Okay, nothing ever transpired, okay.

S.M.:  All right.

Petitioner:  (inaudible) no matter what, nothing ever happened.

S.M.:  Okay.

Petitioner:  Just stick to that and don't let anybody tell you differently.

S.M.:  Okay.

Petitioner:  Okay, no matter what, don't let anybody tell you differently.

S.M.:  Okay, well, I got to go.  Okay?

Petitioner:  All right.

>    S.M.: Bye.
>
>    Petitioner: Bye.
>
>    S.M.: Huh?
>
>    Petitioner: Love you.
>
>    S.M.: Love you too?
>
>    Petitioner: I miss you.
>
>    S.M.: I miss you too.
>
>    Petitioner: Talk to you soon I hope.
>
>    S.M.: Okay.
> . . . .

(Ex. T at 148–51).

Investigator Mathis testified he executed a search warrant on Petitioner's home on June 3, 2003, the day after S.M.'s undercover call (*id.* at 145). He identified State's Exhibit 2 as a package of 19 condoms found on top of a dresser in Petitioner's bedroom, and the condoms were admitted into evidence without objection from defense counsel (*id.* at 147). He identified State's Exhibits 3, 4, 5, and 6 as photographs reconstructed from shreddings found in a shredder in the office of Petitioner's home (*id.* at 147).

Investigator Timothy Bowen testified he is the custodian of evidence for the Bay County Sheriff's Office (Ex. T at 155). He testified he and an intern reconstructed the photographs from the shreddings found in Petitioner's home (*id.* at 155–56, 159). Defense counsel objected to admission of the photographs on the ground that they had no probative value and were irrelevant (*id.* at 156–57). The court overruled the objection and admitted the photographs (*id.* at 158). On cross-examination, Investigator Bowen admitted there was a lot of other shredded material, besides the photographs, including other photographs (*id.* at 159–61).

The defense called Mike Meints as its first witness. Mr. Meints testified he did not know whether S.M. had told Mary about her sexual relationship with Petitioner prior to the family meeting in February or early March of 2003, but he admitted that he stated in his deposition, in November of

2003, that S.M. made the revelation immediately prior to the family meeting (Ex. U at 188–91). Mr. Meints testified that around the first of February, prior to the family meeting, Petitioner talked to him about his wife Mary (Mike Meints' wife) (*id.* at 192). Meints testified he called his wife and told her what Petitioner said, and he also called Brian Backus and discussed the same subject (*id.* at 192–93).

On cross-examination, Mike Meints testified that in February of 2003, he and his wife realized it would be difficult to continue a relationship with Petitioner and also repair their relationship with Lisa (Ex. U at 194). He testified that was the reason for ending further contact with Petitioner (*id.*). Meints also testified that in his November deposition, he clarified he was unsure whether S.M. revealed the sexual relationship to Mary before or after the family meeting (*id.* at 195–96).

Andrea "Rae" Cowell testified she is a year older than S.M. (Ex. U at 263–64). She testified she was a friend of S.M.'s in 2002 until June of 2003 (*id.* at 265). Andrea testified she and her brother Scott, who is 15 years old, had been to Petitioner's home on Oak Brook Lane (*id.* at 266). She testified she used Petitioner's shredder in May of 2003, to shred photographs of S.M. and S.M.'s sister Lisa (*id.* at 267). Andrea testified S.M. told her she had a crush on Petitioner (*id.* at 268). She testified she never saw or heard anything inappropriate between S.M. and Petitioner (*id.*). She testified she was present when S.M. tried to telephone Petitioner from school (*id.* at 269). She testified she never heard S.M. talk about sex (*id.*). Andrea testified S.M. was angry with her, because she (Andrea) was able to see and talk to Petitioner, when S.M. was restricted from having contact with him (*id.* at 269–72). She testified she spent the night at Petitioner's home when S.M. was there, and Scott was sometimes there (*id.* at 270). She testified she never saw or heard anything unusual going on (*id.*). Andrea testified she sometimes spent the night at Petitioner's house once or twice a week (*id.*). She testified S.M. frequently was not there when she was there (*id.*). She testified Petitioner locked his bedroom and kept his dogs in there when kids spent the night (*id.* at 271).

On cross-examination, Andrea testified she shredded the pictures of S.M., because she hated S.M. (Ex. U at 273). She testified at one time, she gave Petitioner a "break in half" necklace (*id.* at 274). She testified she thought of Petitioner as a father figure (*id.*).

Linda Stone testified she is Andrea and Scott Cowell's mother (Ex. U at 238–29). She testified Petitioner is her best friend (*id.* at 239). Ms. Stone testified Petitioner gave her a cell phone that his daughter, Nicole, previously used, and Andrea sometimes used it (*id.* at 239–40). She testified

she borrowed Petitioner's only recliner from July of 2002 until he moved into the house on Oak Brook Lane (*id.* at 241–42). Ms. Stone testified Petitioner asked for her advice about a problem with Mary Meints (*id.* at 245). She testified she told Petitioner he was crazy if he did not tell Mary's husband, Mike, what happened, because at some point Mary would tell Mike, and it would be a different version than Petitioner's version (*id.*). She testified Petitioner took her advice, and stopped working for Mike Meints shortly thereafter (*id.* at 246). On cross-examination, Ms. Stone testified she used her house as collateral to bond Petitioner out of jail (*id.* at 246).

Brian Backus testified Petitioner was a close friend, almost like a brother (Ex. U at 248). He testified he had dinner at Hamilton's Restaurant with Petitioner, Mary Meints, and S.M. (*id.* at 249). Mr. Backus testified he and Mary flirted, and it "went a little too far" that night (*id.*). He testified he did not see anything occur between Mary and Petitioner that night, but something occurred between Mary and himself (*id.* at 250). He testified he told Petitioner about what occurred with Mary and him, and he (Backus) left town the next day (*id.* at 250–51). Mr. Backus testified Mary called him shortly after the incident, but he did not speak to her (*id.* at 251). He testified Mike Meints called him after Mary called (*id.* at 251–52). He testified that around the time Mike Meints called him, he and Mike were discussing buying a boat together (*id.* at 258).

Petitioner testified he and his wife, Lisa, separated in July of 2002 and were divorced in November of 2002 (Ex. U at 199–200). Petitioner testified he lived in a house on South Lagoon Street until September of 2002 (*id.* at 201). Petitioner testified that in November of 2002, he went to dinner with Brian Backus, Mary Meints, and S.M. (*id.* at 203–04). He testified while they were in the parking lot leaving the restaurant, Mary hugged him goodbye and squeezed his butt with her hand (*id.* at 204). He testified Mary then hugged Brian goodbye and grabbed his butt with both hands (*id.*). He testified he did not recall that Mary said anything to Brian (*id.* at 205). He testified in January of 2003, he went to Mary and Mike's house to pick up a check (*id.* at 205–06). He testified he and Mary had a conversation, and then he left with his check (*id.*). He testified the conversation and what occurred at the restaurant bothered him, so he discussed them with Brian Backus and Linda Stone (*id.* at 206). Petitioner testified that based upon Linda Stone's advice, he told Mike Meints, in January or February of 2003, what transpired (*id.* at 206–07). He testified after his conversation with Mike, Mike fired him, and no one from the Meints family had contact with him (*id.* at 207–08). Petitioner

testified that at the time the search warrant was executed on his home on Oak Brook Lane, the home was for sale (*id.* at 209–10). He testified in preparation for selling the house, he sorted through boxes that had been in storage, and shredded old documents and photographs (*id.* at 210). He testified Andrea Cowell helped him with the shredding (*id.* at 211). Petitioner testified he had a 15-year old daughter, Nicole, and a 13-year old son, Justin, from a former marriage (*id.* at 212). He testified they lived with their mother in Michigan (*id.*) Petitioner testified in late 2002 and early 2003, S.M. was calling him "all the time" (*id.* at 212–13). He testified he discussed her frequent phone calls with Mike Meints, and he and Mike both talked to S.M. about "curbing" her phone calls (*id.* at 213). Petitioner testified her phone calls did not stop, so he changed his home number and cell phone number in January of 2003, and did not give the numbers to S.M. (*id.* at 213, 223–25).

Petitioner testified that when S.M. called him on June 2, 2003, he assumed that the "problem" to which she was referring was her parents discovering she was attempting to have contact with him when they had ordered her not to (Ex. U at 213–15). Petitioner testified he told S.M. he loved her, because she was like his little sister (*id.* at 216). He testified he had promised S.M., Nicole and Justin, and Andrea and Scott Cowell that as long as they did well in school and graduated from high school, he would pay for them to go on a vacation on their 18th birthdays (*id.* at 219). Petitioner testified that all of those kids had spent the night at his house (*id.*). He also testified he slept with his dogs in his locked bedroom whenever kids spent the night, because one of his dogs was temperamental (*id.* at 220). Petitioner denied every having a sexual relationship with S.M., including intercourse or oral sex (*id.* at 220–21).

On cross-examination, Petitioner admitted S.M. sometimes spent the night alone with him at his home (Ex. U at 222). Petitioner testified S.M. continued to call him, even after he changed his phone numbers in January of 2003 (*id.* at 224–25). Petitioner admitted that the day after his phone conversation with S.M. on June 2, 2003, he told a child protective services investigator that he had not spoke with S.M. in over a month (*id.* at 226).

III.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the

instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19. In relevant part, section 2254(d) now provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2] The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

---

[2] Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13). The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000). In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim. Moreover, where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. *See* Henderson v. Campbell, 353 F.3d 880, 890 n. 15 (11th Cir. 2003).

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. Whether a State court's decision was an unreasonable

application of a legal principle must be assessed in light of the record the court had before it. Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); *cf.* Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001). "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, — U.S. —, 131 S. Ct. 770, 786–87, 178 L. Ed. 2d 624 (2011)). The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it. *See* Gill, *supra* at 1291 (citing Harrington, 131 S. Ct. at 786). Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *See* Harrington, 131 S. Ct. at 786; *see also* Gill, *supra,* at 1292 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless

objectively unreasonable in light of the evidence presented in the state-court proceeding." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see e.g.* <u>Miller-El</u>, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); <u>Jones v. Walker</u>, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact."). The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See* <u>Gill</u>, 633 F.3d at 1292. A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. *Id.*

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* <u>Panetti v. Quarterman</u>, 531 U.S. 930, 953, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); <u>Jones</u>, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claims.

IV.    PETITIONER'S CLAIMS

A.    <u>Ground One: "Ineffective assistance of defense counsel by failing to present a witness who would have disproved the alleged victim's version of events, and that [sic] Petitioner was denied his right to effective assistance of counsel, all in violation of the Due Process Clause of the Fifth (5th), Sixth (6th), and Fourteenth (14) [sic] Amendments to the U.S. Constitution and Article I, § 16 of the Florida Constitution, but for defense counsel's ineffectiveness, the result of the proceedings would have been different."</u>

Petitioner alleges defense counsel was ineffective for failing to present testimony from his daughter, Nicole McGarry (doc. 23 at 4–6; doc. 25 at 1–5). Petitioner contends his daughter's testimony would have impeached the victim's testimony that during one of the incidents in his bedroom in August of 2002, Nicole and her brother knocked on the bedroom door looking for S.M. (*id.*). Petitioner alleges that at the postconviction evidentiary hearing, his daughter testified there was never a time when she and S.M. were at the house, and she could not find S.M.; and there was never a time when she and her brother knocked on Petitioner's bedroom door asking where S.M. was (*id.*). Petitioner states Nicole also said at the evidentiary hearing that she lived in another state at the time of Petitioner's trial, but she definitely would have testified on his behalf if she had been asked to do so (*id.*). Petitioner alleges defense counsel knew from S.M.'s pre-trial deposition that Nicole was in the home during one of the alleged incidents of sexual contact (*id.*). He contends counsel was ineffective for failing to interview Nicole and present her testimony at trial (*id.*).

Respondent states Petitioner raised this claim as Ground 1 in his amended Rule 3.850 motion (doc. 37 at 4). Respondent contends the state court's adjudication of the claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 4–6).

1.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). To obtain relief under <u>Strickland</u>, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 687–88. If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." <u>Jones v. Campbell</u>, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing <u>Chandler v. United States</u>, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." <u>Strickland</u>, 466 U.S. at 688–89. "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from

counsel's perspective at the time." *Id.* at 689. If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15). Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994). Counsel's performance is deficient only if it is "outside the wide range of professional competence." Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation"). "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting Putman v. Head, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of the Strickland standard, Petitioner's burden of demonstrating prejudice is high. *See* Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002). The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* (quoting Strickland, 466 U.S. at 693). However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome. Strickland, 466 U.S. at 693–94. Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694. Indeed, it would be "contrary to" the law clearly established in Strickland for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence. Williams v. Taylor, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. Strickland, 466 U.S. at 694–95. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695. Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), Strickland prejudice is gauged against the outcome of the trial, not on appeal. See Purvis v. Crosby, 451 F.3d 734, 739 (11th Cir. 2006) (citing Strickland, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. Strickland, 466 U.S. at 698; Collier v. Turpin, 177 F.3d 1184, 1197 (11th Cir. 1999).

      2.      Federal Review of State Court Decision

Petitioner raised this claim in Ground 1 of his amended Rule 3.850 motion (Ex. O at 386). In the state circuit court's written decision denying the claim, the court correctly stated the deficient performance and prejudice prongs of the Strickland standard as the applicable legal standard (Ex. V at 1090). The court adjudicated the claim as follows:

> In her deposition and at trial, the victim, [S.M.], testified that on the night of one of the sexual encounters with the Defendant, the Defendant's children were visiting and that she waited until all the children were asleep before going into the Defendant's room. (SM-37-38; T-56.) However, at trial, the victim testified for the first time that the Defendant made her hide in the bathroom after the Defendant's children knocked on his door looking for the victim. (T-56-57.) At the evidentiary hearing, Nicole McGarry, the Defendant's daughter testified that there was never a time when she was at her father's house with the victim when she could not find the victim. (EH-28-29.) She also testified that she never had to knock on her father's bedroom door asking where the victim was, nor was there a time when the victim was in the bathroom when they could not find her. (EH-28-29.) Although she testified that no one from trial counsel's office contacted her prior to the Defendant's trial, she also stated that her mother "pretty much kept everyone away." (EH-31-32.) The Defendant alleges trial counsel was ineffective in failing to investigate and present Nicole McGarry[FN 1] as a witness to refute the victim's testimony. This claim lacks merit.
>
> [FN 1: In his amended motion, the Defendant included Stacey Gibson as a witness his trial counsel should have investigated. However, Ms.

Gibson was not called as a witness during the evidentiary hearing, she did not file an affidavit indicating what her testimony would have been, and the Defendant has not included her name in any further arguments.]

Pursuant to *Strickland*, the touchstone of any analysis of trial counsel's investigation for the purposes of an ineffective assistance of counsel claim is one of reasonableness. 466 U.S. at 691 ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigation unnecessary."). Although the victim stated in her deposition that the Defendant's children were at the house, she stated they were asleep while she was in the bedroom with the Defendant. (SM-37-38.) It was not until trial that the victim revealed that the Defendant's children awoke to find the victim missing and when they knocked on the Defendant's bedroom door, he told the victim to go into his bathroom. (T-56-57.) Based on the victim's deposition testimony that the Defendant's children were asleep when the conduct occurred and that the children's mother "pretty much kept everyone away" during the Defendant's trial, it was not unreasonable for trial counsel to believe that it was unnecessary to investigate the children.

Even if trial counsel's conduct was deficient, the Defendant has not established that the deficiency was prejudicial. At trial, Paul Komarek, the Defendant's trial counsel, not only directly impeached the victim, he also refuted her testimony via the testimony of other witnesses. He was able to impeach the victim by highlighting her failure to provide details in her deposition that she was able to provide at trial. (T-80-83, 88-89.) He was able to refute the victim's testimony concerning a recliner that she testified she and the Defendant "made out" in (T-51-52; 240-42), and he was able to refute the victim's explanation regarding why she did not go to school one morning following one of the sexual encounters with the defendant. (T-58-59, 242-44.) Additionally, Ms. McGarry's refutation of the victim's testimony is limited to only one of the three charged incidents. Based on the totality of the evidence presented at trial, the Defendant has not established that there is a reasonable probability that but for Mr. Komarek's failure to investigate and call Ms. McGarry as a witness at trial the outcome of the trial would have been different.

Moreover, the Defendant's reliance on *State v. Yarbrough*, 871 So. 2d 1026 (Fla. 1st DCA 2004), is misplaced as *Yarbrough* is distinguishable from the instant case. Unlike in *Yarbrough*, where the uninvestigated witness would have directly supported the defendant's defense that the victim consented to sex, in the instant case, Ms. McGarry's testimony did not directly support the Defendant's theory that the victim's family had pressured the victim to make up the charges. Instead, her testimony would have only refuted part of the victim's testimony regarding one of the three charged incidents. Additionally, in *Yarbrough*, the defendant and his wife provided counsel with the witness's name ten months before trial and specifically told

> counsel what information the witness would provide. However, in the instant case, the Defendant never gave counsel any indication before trial that his daughter may be a prospective witness. (K-23.)

(Ex. V at 1090–91). Petitioner appealed the circuit court's decision to the First DCA, and the appellate court affirmed the lower court's decision without written opinion.

Petitioner contends the First DCA's per curiam affirmance without opinion does not constitute an adjudication on the merits; therefore, no deference is due the state court's decision (doc. 25 at 4–5). This contention that the First DCA did not adjudicate the merits of his claim is without merit. Section § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been "adjudicated on the merits." *See* Harrington v. Richter, 562 U.S. —, 131 S. Ct. 770, 784, 178 L. Ed. 2d 624 (2011). When a state court issues an order that summarily rejects without discussion all the claims raised by a defendant, including a federal claim that the defendant subsequently presses in a federal habeas proceeding, the federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits in the absence of any indication or state-law procedural principles to the contrary. 131 S. Ct. at 784–85. The presumption may be overcome when there is a reason to think some other explanation for the state court's decision is more likely. *Id.* at 785. Petitioner, however, has not made that showing in this case. Therefore, the undersigned concludes the First DCA's decision constituted an adjudication on the merits.

Petitioner has failed to rebut the state court's factual findings with clear and convincing evidence. Further, those findings are supported by the state court record, including the trial transcript, evidentiary hearing transcript, and deposition transcripts that are part of the record. Attorney Komarek testified during his deposition that he had nearly thirty (30) years of experience as a criminal defense attorney and had been a board certified criminal defense attorney for eight (8) years at the time of Petitioner's trial (*see* Ex. Q at 817). He testified as follows regarding his not calling Nicole McGarry as a witness:

> A [by Attorney Komarek]: Mr. McGarry has certain responsibilities, also. One of my first letters to him, if not the first letter to him is to, you are supposed to help and give me names of witnesses. These were his children. They were minors and they lived out of state.
>
> He never gave me any of those children as names to be called at the trial in this case. And I sent, as is my custom, to send the defendant everything in every case.

So he had all the depositions, all the letters, correspondence, DCF [the child protective services agency] notes, logs, doctors' reports, videos to review, and everything that there was that I had.

Never did he give me the name of his children, to bring them down here and have them testify under oath in this kind of a trial.

Q [by Petitioner's counsel]: Did you actually have a discussion in addition to sending the letter with Mr. McGarry concerning any potential witnesses or people who may have information?

A: We from time to time frequently had discussions about witnesses.

Q: And specifically Nicole McGarry, did you have a discussion about her?

A: Not to my knowledge.
. . . .
Q: Okay. And did he bring anything up about Nicole McGarry at trial?

A: Not that I can recall. It would have been too late then anyway. He was aware that all the witnesses needed to be listed in advance.

(Ex. Q at 836–37).

Petitioner argues Attorney Komarek was aware that Nicole McGarry was a potential witness, because S.M. mentioned in her deposition that Nicole was in the house during one of the sexual encounters. However, during her deposition, S.M. also stated Nicole and Justin were <u>asleep</u> at the time she was in Petitioner's bedroom (Ex. Q at 898–99); it was not until S.M.'s trial testimony that she stated Nicole and Justin knocked on the bedroom door looking for her. In light of S.M.'s deposition testimony and the fact that Petitioner never told Attorney Komarek that Nicole was a potential witness, the state court reasonably concluded counsel's failure to investigate Nicole McGarry as a potential witness and present her testimony at trial was not deficient.

Petitioner failed to demonstrate that the state court's adjudication of this claim was based upon an unreasonable determination of the facts, or contrary to or a unreasonable application of <u>Strickland</u>. Therefore, he is not entitled to relief on Ground One.

B. <u>Ground Two: "Ineffective assistance of counsel in that defense counsel failed to object to the State's discovery violation, all in violation of the Due Process Clause of the Fifth (5th), Sixth (6th), and Fourteenth (14) [sic] Amendments to the U.S. Constitution and Article</u>

<u>I, § 16 of the Florida Constitution, but for defense counsel's ineffectiveness, the result of the proceedings would have been different."</u>

Petitioner asserts S.M. testified at trial to more details regarding the first sexual encounter (when Nicole and Justin McGarry were in the home) than in her deposition (doc. 23 at 6–8; doc. 25 at 6–11). Further, S.M. admitted in her trial testimony that after her deposition, she provided the prosecutor with more details of that first encounter (*id.*). Petitioner contends the State's failure to disclose the material alterations in S.M.'s testimony provided a basis for defense counsel to object as a discovery violation, request a <u>Richardson</u>[3] hearing, move for a continuance, or move for a mistrial (*id.*).

Respondent states Petitioner raised this claim as Ground 13 in his amended Rule 3.850 motion (doc. 37 at 7). Respondent argues that the state court concluded that no violation of Florida's criminal discovery rules occurred, which is a determination to which this federal court must defer (*id.*). Further, Respondent notes that the state court found as fact that defense counsel made a tactical decision to utilize the difference between S.M.'s deposition testimony and trial testimony to impeach her credibility (*id.* at 7–8). Respondent contends the state court reasonably concluded that defense counsel's tactical decision, to use the new information to impeach the S.M. and suggest she had been coached, was reasonable. Therefore, the state court's adjudication of this claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.*).

1.     Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

2.     Federal Review of State Court Decision

Petitioner raised this claim as Ground 13 in his amended Rule 3.850 motion (Ex. O at 394–95). The state circuit court adjudicated the claim as follows:

> In Ground 13, the Defendant alleges trial counsel was ineffective in failing to object to the State's discovery violation due to differences in the victim's testimony during her deposition and at trial. This claim lacks merit.

---

[3] In <u>Richardson v. State</u>, 246 So. 2d 771 (Fla. 1971) the Florida Supreme Court held that if the State fails to comply with a discovery rule, the court must conduct an inquiry into the circumstances of the violation.

Generally, under Florida Rule of Criminal Procedure 3.220(b)(1)(B), "the state is not required to disclose to the defendant a witness's oral statement if the statement has not been reduced to writing or recorded . . . ." *Elghomari v. State*, 36 Fla. L. Weekly D304, 2011 WL 408833, 4 (Fla. 4th DCA 2011) (citing *State v. McFadden*, 50 So. 3d 1131 (Fla. 2010)). However, the State must disclose an "oral statement [that] materially alters a prior written or recorded statement previously provided by the State to the defendant." *Id.* (internal quotations omitted); *see also Scipio v. State*, 928 So. 2d 1139 (Fla. 2006).

During her deposition, the victim was unable to recall the details of her first sexual encounter with the Defendant; specifically, she did not include any information that she went into a bathroom after the Defendant's children knocked on his bedroom door. (M-52-57.) Although at trial the victim provided more details regarding the first incident with the Defendant (T-53-55) and she disclosed she went into a bathroom during one of the incidents (T-57), she was still unable to recall specific details such as dates, times, or the frequency of sexual encounters with the Defendant. (T-80-83.) The victim also testified she had provided these details to the State after her deposition. (T088-89.) Because there is no evidence that the victim's post-deposition oral statements to the State were reduced to writing or recorded, the State was not required to provide them to the Defendant pursuant to *McFadden*. Moreover, the discrepancies between the victim's deposition and her testimony did not amount a [sic] "material change" under *Scipio*. The victim did not recant her deposition testimony, *see Scipio*, 928 So. 2d at 1150, nor did her testimony change from that which if believed by the jury would not have supported a conviction to that which would have supported a conviction, *see Bell v. State*, 930 So. 2d 779 (Fla. 4th DCA 2006). Accordingly, the Court agrees with counsel that the changed testimony was not a discovery violation (K-30.) Moreover, contrary to the Defendant's claim that the change in the victim's testimony surprised and caught his trial counsel off-guard, Mr. Komarek viewed it as an opportunity to cross examine and impeach the victim. (K-30.) In fact, at trial, counsel did impeach the victim based on her failure to include the bathroom incident in her deposition as well as the lack of detail she provided in her deposition about her first sexual encounter with the Defendant. ([T]-88.) Based on the foregoing, the Court finds counsel was not deficient in failing to object to the alleged discovery violation.

(Ex. V at 1097). Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower court's decision without written opinion.

The state court's factual findings are supported by the trial transcript and Attorney Komarek's deposition. In his deposition, Attorney Komarek testified he did not deem the State's failure to disclose the new details included in the victim's trial testimony as a discovery violation or as requiring a <u>Richardson</u> hearing (Ex. V at 844). Komarek's testimony further demonstrates he made

a tactical decision to use the new details as a means of impeaching the victim's credibility, by suggesting they were the product of coaching by the prosecutor (*id.*).

Additionally, this court must defer to the state court's determination that no violation of Florida's discovery rules occurred. *See* Bradshaw v. Richey, 546 U.S. 74, 76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005); Mullaney v. Wilbur, 421 U.S. 684, 691, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975). When the state courts have already answered the question of how an issue would have been resolved under that state's law had defense counsel done what the petitioner argues he should have done, "federal habeas courts should not second-guess them on such matters" because "it is a fundamental principle that state courts are the final arbiters of state law." Callahan v. Campbell, 427 F.3d 897, 932 (11th Cir. 2005) (quotation marks omitted). Because this federal habeas court will not "second guess" the Florida state courts' conclusion that the State's failure to disclose the new details in the victim's testimony was not a discovery violation under state law, Petitioner cannot demonstrate that his counsel was deficient for failing to object to its admission, request a hearing, or move for a continuance or mistrial. *See id.* A lawyer cannot be deficient for failing to raise a meritless claim. Freeman v. Attorney Gen., 536 F.3d 1225, 1233 (11th Cir. 2008). The state courts' rejection of this claim was neither contrary to nor involved an objectively unreasonable application of Strickland.

   C.   Ground Three:  "Ineffective assistance of counsel in that defense counsel failed to locate, investigate, question, and present defense witness Richard Tolbert at trial, all in violation of the Due Process Clause of the Fifth (5th), Sixth (6th), and Fourteenth (14) [sic] Amendments to the U.S. Constitution and Article I, § 16 of the Florida Constitution, but for defense counsel's ineffectiveness, the result of the proceedings would have been different."

Petitioner contends Attorney Komarek was ineffective for failing to investigate defense witness Richard Tolbert prior to trial (doc. 23 at 8–10; doc. 25 at 11–13). He asserts counsel discovered Tolbert as a witness after trial and before sentencing, and counsel filed a motion for new trial based upon Tolbert's proposed testimony that S.M. told him she fabricated her allegations against Petitioner (*id.*). Petitioner alleges the trial court denied the motion for new trial, on the ground that Tolbert's information could have been discovered prior to trial (*id.*). Petitioner alleges at the postconviction evidentiary hearing, Monica Jordan, an investigator, testified that her protocol in investigating allegations is to investigate and interview all persons who may have information about

the complainant (*id.*). Petitioner argues if Attorney Komarek had conducted a reasonable investigation, he would have discovered Tolbert as a witness to the victim's recantation (*id.*). He alleges if the jury had heard Tolbert's testimony, the result of his trial would have been different (*id.*).

Respondent concedes Petitioner raised this claim as Ground 2 in his amended Rule 3.850 motion (doc. 37 at 9). Respondent argues Tolbert admitted in his affidavit, executed in late July of 2004, that he did not mention his conversation with the victim until after Petitioner's trial (*id.*). Respondent further argues Attorney Komarek "implicitly-but-reasonably" decided to use trial preparation time for other purposes (*id.*). Respondent contends the state court's adjudication of this claim was not contrary to or an unreasonable application of clearly established federal law (*id.*).

      1.      Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

      2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground 2 in his amended Rule 3.850 motion (Ex. O at 386–87). The state circuit court adjudicated the claim as follows:

> In Ground 2, the Defendant alleges trial counsel was ineffective in failing to locate and investigate Richard Tolbert, a friend of the victim's to whom the victim allegedly admitted that the allegations she made against the Defendant were not true. This claim lacks merit.
>
> As an initial matter, the Court is not persuaded by the Defendant's assertion that this Court's denial of the Defendant's motion for new trial is now the law of the case. *See* Phillip J. Padovano, *Florida Appellate Practice*, § 20:12 n.3 (2011 ed.) ("The doctrine of the law of the case does not apply to trial court orders. It applies only to prior appellate decisions in the same case.") (citing *State v. McBride*, 848 So. 2d 287 (Fla. 2003)). The Court is also not persuaded by the Defendant's argument that because the State argued on appeal that this Court did not err in denying the motion for new trial because "there is no reason why [the Defendant] could not have discovered Tolbert's claims prior to trial," the State cannot now argue that counsel was not ineffective. If the Court were to accept this argument, then it must also logically follow that because the Defendant argued on appeal that the trial court erred in denying his motion for a new trial because he could not have discovered Mr. Tolbert prior to trial, then the Defendant would likewise now be estopped from arguing that because counsel could have discovered Mr. Tolbert prior to trial he was ineffective.
>
> As previously noted, the touchstone of any analysis of trial counsel's investigation is one of reasonableness. *Strickland*, 466 U.S. at 691. The Defendant's

trial was held on June 17 and 18, 2004. According to Paul Komarek, the Defendant's trial counsel, he did not learn about Mr. Tolbert until July 12, 2004—almost a month after trial. (K-24.) He learned about Mr. Tolbert from Linda Stone, the Defendant's then-girlfriend, who learned about him from her daughter, Andrea Cowell. (K-24-25.) After Mr. Komarek learned about Mr. Tolbert, he sent his investigator to talk to him, which ultimately led to the motion for new trial based on information provided by Mr. Tolbert.[FN 2] (K-25.) There is no indication Linda Stone or Andrea Cowell knew about the victim's statements to Mr. Tolbert before trial. Nor is there any evidence that anyone provided trial counsel with any information about Mr. Tolbert until after the trial. In fact, based on the record, it appears the only way counsel could have possibly discovered Mr. Tolbert would have been to locate and interview every single person who knew the victim. Such an extensive investigation is not required under *Strickland* or the Sixth Amendment. *See id.* Therefore, the Court finds trial counsel's inability to locate Mr. Tolbert was not deficient.

[FN 2: The motion for a new trial was denied.]

Finally, the Court notes that Mr. Tolbert's testimony at the evidentiary hearing is not insignificant. He testified he and the victim were only friends for a few months. (EH-20-21.) He could not remember when he met the victim or when the victim made the statements regarding the crimes. (EH-19-20.) Significantly, he could not remember anything the victim told him about the Defendant. (EH-20.) Generally, Mr. Tolbert could neither verify nor remember much of what he stated in his 2004 affidavit. (EH 21-23.) Based on this testimony, the Court finds even in the unlikely event trial counsel's conduct was deficient, the Defendant has not shown a reasonable probability that the inclusion of Mr. Tolbert's testimony at trial would have changed the outcome of the trial.

(Ex. V at 1091–92). Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower court's decision without written opinion.

Richard Tolbert's affidavit, executed July 29, 2004, states he knows S.M., and they were friends in the year 2003 (Ex. A at 114). His affidavit states he had a telephone conversation with S.M. after Petitioner was charged with the offense in 2003 and while Petitioner was still in jail, and during that conversation, S.M. told him that the allegations she made against Petitioner were not true (*id.*). Mr. Tolbert's affidavit states he did not tell anyone about this conversation until after Petitioner was convicted (*id.*).

The state court record demonstrates that prior to Petitioner's conviction on June 18, 2004, he was in jail for only two days, from June 3 to June 5, 2003 (Ex. A).[4]  According to Mr. Tolbert's affidavit, it was during this period that S.M. told him the allegations against Petitioner were not true.

In response to Attorney Komarek's motion for new trial and Tolbert's affidavit, the prosecutor argued the truthfulness of Mr. Tolbert's affidavit was suspect (Ex. A at 132–33).  The prosecutor stated S.M. advised that she did not meet Tolbert until October of 2003, several months after Petitioner was released from jail, and S.M. denied she ever told Mr. Tolbert that her allegations regarding Petitioner were untrue  (*id.*).  The prosecutor submitted S.M.'s affidavit, executed August 2, 2004, in which she denied that she ever told Mr. Tolbert that her allegations regarding Petitioner were untrue, and she affirmed that her trial testimony was true (*id.* at 135).  The prosecutor also submitted affidavits of Kayla Marciniak, Kimberly Marciniak (Kayla's mother), and John "Nate" File (*id.* at 123–27).  Kayla and Kimberly Marciniak stated they received "harassing" telephone calls from Linda Stone and Andrea Cowell urging them to go to Attorney Komarek's office to falsely state that S.M. told them the allegations she made against Petitioner were false (*id.* at 123–26).  Both women stated they refused to comply with the requests (*id.*).  Mr. File stated he received a "harassing" telephone call from Attorney Komarek's office asking if he knew of S.M. and knew that the allegations she made against Petitioner were not true (*id.* at 127).  Mr. File stated he denied having any such knowledge, but the caller insisted upon a personal interview, which he refused (*id.*).

At the postconviction evidentiary hearing, Mr. Tolbert testified he and S.M. were friends for a few months (Ex. T at 1035–36).  He testified he did not recall:  (1) when he met S.M., (2) when she allegedly told him she fabricated the allegations, (3) how the subject matter came up in their conversation, (4) what she specifically said about the allegations being false, (5) what she said about Petitioner in general, or (6) whether anything in his affidavit was true (*id.* at 1034–37).

During Attorney Komarek deposition, he testified that on July 12, 2004, he was first notified of Mr. Tolbert's conversation with the victim (Ex. Q at 838).  Komarek testified that Linda Stone, Petitioner's girlfriend at that time, notified him that her daughter, Andrea Cowell, told her "last Wednesday," which Komarek calculated as July 7, 2004, about Tolbert's information (*id.* at 838–39).

---

[4] At Petitioner's sentencing, the court gave Petitioner pre-sentence jail credit of 51 days, but this included 49 days from the date he was convicted on June 18, 2004, to the date of his sentencing on August 6, 2004.

Attorney Komarek testified when Stone gave him this information, he and his investigator located Tolbert and talked to him (*id.*). Komarek filed Tolbert's affidavit on July 30, 2004, with a motion for new trial (Ex. A at 112–14). Attorney Komarek testified that Linda Stone and Andrea Cowell were involved in Petitioner's case all along, and were motivated to help Petitioner (indeed, both of them testified on Petitioner's behalf at trial), but neither they nor Petitioner ever advised Komarek of this potential witness until after Petitioner's trial (Ex. Q at 839). He testified he inquired of S.M. during her deposition in September of 2003 whether she had ever told anyone that nothing sexual happened between her and Petitioner, and she responded no (*id.* at 838).

At the postconviction evidentiary hearing, Petitioner's counsel presented testimony from Monica Jordan, a private investigator. Ms. Jordan testified she would have asked Andrea Cowell to identify everyone with whom S.M. came into contact, and then spoken to each individual she identified to determine the victim's reputation for truthfulness and whether the victim had discussed the allegations with him or her (Ex. S at 1052–55).

At the evidentiary hearing, Andrea Cowell testified she knew that Richard Tolbert knew S.M. and communicated with her (Ex. Q at 1042). She testified if someone had asked her with whom S.M. communicated, she would have identified Richard Tolbert, but no one asked her (*id.*). She testified S.M. also "hung out" with Kayla Marciniak (*id.*).

The state court reasonably determined that Attorney Komarek's failure to investigate Richard Tolbert was not deficient. Attorney Komarek asked S.M. during her deposition the names of her closest friends (Ex. Q at 881). S.M. responded that Kayla Marciniak was her closest friend, and she listed three other people, none of whom were Richard Tolbert (*id.* at 881–82). Komarek also asked S.M. whether she had told anyone that her allegations were untrue, and she responded no (*id.* at 912). Additionally, Attorney Komarek reasonably relied upon Linda Stone and Andrea Cowell (who were unwavering supporters of Petitioner prior to, during, and after Petitioner's trial), as well as Petitioner himself (who was incarcerated only two days of the one-year period between his initial arrest and trial), to come forward with the name of any person who may have information regarding the victim's allegations. There is no evidence anyone provided Richard Tolbert's name to Attorney Komarek prior to trial. Tolbert himself admitted he waited until after Petitioner's trial to disclose this information.

Petitioner failed to demonstrate that defense counsel's failure to discover Richard Tolbert as a witness was unreasonable. Therefore, the state court's denial of this claim was not unreasonable.

    D.    <u>Ground Four</u>: "Ineffective assistance of counsel in that defense counsel failing [sic] to move to dismiss the amended counts of the Information and/or move the court for a continuance due to the late filing of the Information, all in violation of the Due Process Clause of the Fifth (5th), Sixth (6th), and Fourteenth (14) [sic] Amendments to the U.S. Constitution and Article I, § 16 of the Florida Constitution, but for defense counsel's ineffectiveness, the result of the proceedings would have been different."

Petitioner asserts in August of 2003, the State charged him with one count of lewd or lascivious battery on S.M., alleging the offense occurred between July 1, 2002 and January 31, 2003 (doc. 23 at 10–12; doc. 25 at 13–15). He asserts just three days prior to jury selection, the State amended the information to charge him with three counts of lewd or lascivious battery on S.M., alleging two offenses occurred between July 1, 2002 and September 15, 2002, and the third offense occurred between September 1, 2002 and January 31, 2003 (*id.*). Petitioner alleges the nature of his defense was substantially altered by the amendment, and defense counsel did not have adequate time to prepare a defense (*id.*). He alleges counsel should have objected to the amendment or moved for a continuance to prepare for the new counts (*id.*). He alleges if counsel had done so, the jury would have acquitted him of the "new counts," or defense counsel would have realized that Count 3 overlapped with Count 1, and either the jury would have acquitted him of Count 3 or the trial court would have dismissed Count 3 (*id.*).

Respondent concedes Petitioner raised this claim as Ground 3 in his Rule 3.850 motion (doc. 37 at 10). Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.*).

    1.    Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

    2.    Federal Review of State Court Decision

Petitioner raised this claim as Ground 3 in his amended Rule 3.850 motion (Ex. O at 387–88). The state circuit court adjudicated the claim as follows:

> In Ground 3, the Defendant alleges trial counsel was ineffective in failing to move to dismiss the amended information, which increased the number of charges of lewd and lascivious from one to three, or move for a continuance due to the State's late-filed amended information. This claim lacks merit.

Although the State filed the amended information on June 8, 2004—three days before jury selection—the trial did not begin until June 17, 2004—nine days after the amended information was filed. Additionally, counsel knew during plea negotiations that if the Defendant did not agree to the State's proposed plea agreement, the State intended to amend the information to add the additional counts. (EH-58, 61-62; K-13). He had already deposed the victim and knew of the facts related to the additional counts. (K-13, 15-16.) Significantly, Mr. Komarek explained that because he was not surprised by the State's amended information, he could not, in good faith, file a motion for a continuance. (K-13.) Based on the foregoing, the Court finds counsel's decision not to move to dismiss the amended information or move for a continuance was not deficient.

Even if counsel's conduct was deficient, the Defendant has not established that in light of all the evidence surrounding his conviction, trial counsel's failure rendered the results of the proceeding unreliable. *Henry [v. State]*, 948 So. 2d [609,] 612 [Fla. 2006]. First, notwithstanding trial counsel's ethical obligation to only file motions in good faith, the Defendant has not established a reasonable probability that either a motion to dismiss or a motion for a continuance would have been granted. *See Peevey v. State*, 820 So. 2d 442, 423 (Fla. 4th DCA 2002) ("It is well settled that 'the state may substantively amend an information during trial, even over the objection of the defendant unless there is a showing of prejudice to the rights of the defendant.") Second the Defendant has not shown that even if a continuance were granted, that there is a reasonable probability that the outcome of the trial would have been different. As explained above, by the time the State filed the amended information trial counsel had already deposed the victim and knew the facts related to the new counts. *See Henderson v. State*, 810 So. 2d 999 (Fla. 4th DCA 2002) (affirming trial court's denial of motion for continuance following filing of amended information where, *inter alia*, the defense was aware of the proposed amendment two days before trial and thus had adequate time to prepare for the amended charges.) Based on the foregoing, the Court finds counsel's conduct did not prejudice the Defendant.

(Ex. V at 1092–93). Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower court's decision without written opinion.

Attorney Komarek testified in his deposition that prior to the State's amending the information, the prosecutor notified him that she intended to amend the information to charge three counts of lewd or lascivious battery involving S.M. instead of one (Ex. Q at 826–31). Komarek testified he had already taken S.M.'s deposition, and she described three acts of lewd and lascivious battery by Petitioner, so he knew the factual basis for each of the three counts (*id.*). Komarek testified he researched whether a continuance would be appropriate, but he could not ethically state in good faith that he was surprised by the amendment; therefore, he chose not to seek a continuance (*id.*).

In light of Attorney Komarek's knowledge, prior to trial, that the State intended to add two counts, and his knowledge, several months prior to trial, of the factual basis for each count, his decision to forgo seeking a continuance or dismissal of the "new" charges was not unreasonable. Further, in light of the state court's conclusion that there was no reasonable probability that either a motion to dismiss or a motion for a continuance would have been properly granted, Petitioner failed to demonstrate he was prejudiced by counsel's alleged error. Therefore, he failed to establish entitlement to habeas relief on Ground Four.

      E.      <u>Ground Five</u>: "<u>Ineffective assistance of counsel in that defense counsel failed to object to the overlapping dates of Count 1 and Count 3 of the new amended Information and by failing to request a Bill of Particulars, all in violation of the Due Process Clause of the Fifth (5th), Sixth (6th), and Fourteenth (14) [sic] Amendments to the U.S. Constitution and Article I, § 16 of the Florida Constitution, but for defense counsel's ineffectiveness, the result of the proceedings would have been different.</u>".

Petitioner asserts Count 1 of the amended information alleged the offense conduct occurred between July 1, 2002 and September 15, 2002, and Count 3 alleged the offense conduct occurred between September 1, 2002 and January 31, 2003 (doc. 23 at 12–13; doc. 25 at 16–18). He alleges the jury instructions did not distinguish the act that formed the basis for Count 1 from the act that formed the basis for Count 3 (*id.*). Petitioner alleges the jury thus could have found him guilty of both counts based upon one act that occurred within the overlapping time frame of September 1–15, 2002 (*id.*). He contends defense counsel should have moved to dismiss one of the counts, on the ground that it subjected Petitioner to double jeopardy (*id.*). He argues defense counsel also should have moved for a statement of particulars (*id.*). Petitioner alleges if counsel had done so, either Count 3 would have been dismissed, or the information would have been amended to allege dates that did not overlap (*id.*).

Respondent concedes Petitioner raised this claim in his Rule 3.850 motion (doc. 37 at 10). Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.*).

      1.      Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

      2.      Federal Review of State Court Decision

Petitioner raised this claim in Grounds 5 and 14 in his amended Rule 3.850 motion (Ex. O at 389, 396). The state circuit court adjudicated the claim as follows:

In Grounds 5 and 14, the Defendant alleges trial counsel was ineffective in failing to request a statement of particulars and in failing to object to the overlapping dates in Counts 1 and 3 of the amended information. Specifically, he alleges the late-filed amended information contained vague and overlapping timelines that were "impossible to defend" and thus counsel should have requested a statement of particulars. The Defendant further alleges that due to the overlapping dates of Counts 1 and 3, counsel should have moved to dismiss one of the counts on double jeopardy grounds. These claims lack merit.

Regarding the Defendant's claim trial counsel was ineffective in failing to request a statement of particulars, the Court finds counsel did not have a good faith basis to request a statement of particulars, and thus was not deficient in failing to request a statement of particulars. *See Williams v. State*, 987 So. 2d 1 (Fla. 2008) (denying ineffective assistance of counsel claim where counsel did not believe he had a good faith basis for doing so); *Saldana v. State*, 980 So. 2d 1220 (Fla. 2d DCA 2008) (holding trial court did not err in denying motion for statement of particulars where the information sufficiently informed the defendant of the charges against him). Mr. Komarek knew before the State filed the amended information that the amended information would add two counts because the discovery, including the victim's deposition, consistently indicated there were three separate acts, and thus he had sufficient factual knowledge of the three acts that made a statement of particulars unnecessary. (K-15-18; 33-34.) Additionally, based on Mr. Komarek's experience as a certified criminal defense attorney, he believed the State's response to a statement of particulars would not have provided him any more information than what was already contained in discovery. (K-19; 33-34.) Therefore, counsel was not deficient in failing to request a statement of particulars.[FN 3]

[FN 3: The Court notes the Defendant's own expert, Ethan Way, did not question trial counsel's decision not to request a statement of particulars. (EW-11.)]

Even if counsel was deficient, the Defendant has not established a reasonable probability that the outcome of the trial would have been different but for counsel's deficient performance. *Peterka [v. State]*, 890 So. 2d [219,] 228 [Fla. 2004]. First, it is uncertain whether this Court would have granted trial counsel's request for a statement of particulars. (K-19-20); *Saldana*, 980 So. 2d at 1222. Second, as counsel indicated, even if such a request were granted, there was no indication the State's statement of particulars would have provided him with any additional details beyond what was already obtained in discovery. *See* Fla. R. Crim. P. 3.130(n) ("The statement of particulars shall specify *as definitely as possible* the place, date, and all

other material facts of the crime charged that are specifically requested and are *known* to the prosecuting attorney. . . .") (emphasis added); *Easterly v. State*, 22 So. 3d 807 (Fla. 1st DCA 2009) (holding the State is not required to allege specific dates in an information charging crimes of child sexual abuse but must narrow the timeframes as much as possible.) Finally, as noted above, counsel knew of, and was adequately prepared to defend at trial, each of the three incidents alleged in the amended information. (K-15-19; 33-34.) Consequently, the Defendant was not prejudiced by counsel's alleged deficiency.

Regarding the Defendant's double jeopardy claim, Count 1 of the amended information alleged the Defendant committed lewd and lascivious battery between July 1, 2002 and September 15, 2002, and Count 2 of the amended information alleged the Defendant committed lewd and lascivious battery between September 1, 2002 and January 31, 2003. Therefore, the counts covered overlapping time periods from September 1, 2002 to September 15, 2002. The Defendant claims this overlap violated double jeopardy, and thus counsel should have filed a motion to dismiss one of the two new counts. The Court finds counsel's conduct was not deficient, and even if it was deficient, it was not prejudicial.

During his deposition, Mr. Komarek explained he was unaware of any double jeopardy claims because the discovery consistently indicated there were three separate acts. (K-15-17.) He further indicated that he was unsure whether the overlapping grounds would violate double jeopardy. (K-16.) Despite his uncertainty whether a double jeopardy claim existed due to the overlapping periods of time in Grounds 1 and 2, it is clear that no such claim existed as a matter of law. *See Vizcon v. State*, 771 So. 2d 3 (Fla. 3d DCA 2000) (holding double jeopardy did not bar convictions for 29 counts of money laundering where dates on each count of information overlapped). Moreover, despite the overlapping time periods in Counts 1 and 2, the record at trial clearly indicated the Defendant committed three separate and distinct acts of lewd and lascivious battery between July 2002 and September 2002. *See Vizcon*, 771 So. 2d at 4; *Nicholson v. State*, 57 So. 2d 1227 (Fla. 4th DCA 2000). Specifically, at trial the victim testified that (1) she and the Defendant had vaginal intercourse at a rental house on South Lagoona [sic] (T-53-54); (2) the Defendant performed oral sex on her at the same rental house when the Defendant's children were visiting (T-56-57); and (3) she and the Defendant had vaginal intercourse and oral sex at a house on Oak Brook Lane (T-58-59). Based on this evidence (in addition to the other evidence presented at trial) there was sufficient evidence for the jury to convict the Defendant on all three counts. Therefore, any motion to dismiss on double jeopardy grounds would have been denied. Accordingly, counsel was not deficient in failing to file a motion to dismiss, nor is there a reasonably [sic] probability that such a motion would have changed the outcome of the trial.

(Ex. V at 1093–95). Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower court's decision without written opinion.

Attorney Komarek testified in his deposition that he did not object to the overlapping dates in the charging document, because the victim enumerated three separate acts of sexual battery in her deposition, and the other discovery materials were consistent with her description of the three acts (Ex. Q at 829–31, 847–48). He testified the victim provided details regarding the locations, circumstances, and "on or about" dates of each of the three acts, and although the dates overlapped, the victim consistently described three separate acts that occurred during the time frames set forth in the amended information (*id.*). Regarding the motion for a statement of particulars, Komarek testified that his past experience with Judge Sirmons, the judge who presided over all pretrial matters in Petitioner's case, was that if a defendant filed a motion for a statement of particulars, Judge Sirmons would instruct the parties to first conduct discovery, and then request a statement of particulars if necessary (*id.* at 832–33). Komarek testified that even then, Judge Sirmons would not require the State to provide a statement of particulars that was any more definite or specific than the facts revealed in discovery (*id.*). Komarek testified that in Petitioner's case, the victim testified in her deposition regarding sufficient facts underlying each of the three charges such that he was able to prepare a defense, so his filing a motion for statement of particulars would not have resulted in the State's providing any more specific information regarding the offenses (*id.*).

In light of the Attorney Komarek's testimony that after the victim's deposition and his review of other discovery materials, he was cognizant of the material facts underlying each of the three charges of lewd or lascivious battery, as well as the state court's determination that Komarek did not have a good faith basis under state law to request a statement of particulars, Petitioner failed to demonstrate Komarek's failure to file a motion for a statement of particulars was unreasonable.

Additionally, Petitioner failed to demonstrate that Attorney Komarek had a meritorious basis for objecting the overlapping dates in the amended information, on double jeopardy grounds. The statute in effect at the time of Petitioner's offense conduct (July of 2002 to January 31, 2003) provided, in relevant part:

**(4) Lewd or lascivious battery**.—A person who:

(a) Engages in sexual activity with a person 12 years of age or older but less than 16 years of age; or

(b) Encourages, forces, or entices any person less than 16 years of age to engage in sadomasochistic abuse, sexual bestiality, prostitution, or any other act involving sexual activity

commits lewd or lascivious battery, a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

Fla. Stat. § 800.04(4)(a). The Florida statute plainly punishes any discrete act of touching in a lewd or lascivious manner rather than continuous conduct of doing so, and the Florida courts have interpreted the statute as doing so. *See* State v. Paul, 934 So.2d 1167, 1173 (Fla. 2006) (holding that two criminal episodes of lewd and lascivious conduct occurred where defendant touched the victim's genital area or the clothing covering it and kissed the victim on the neck upon entering the living room, and then defendant invited the victim to a more private room and exposed his genitals and rubbed them on the victim's stomach).

In the victim's deposition, she described two separate sexual batteries that occurred on two different dates while Petitioner was living in a house on South Lagoon during the period July of 2002 to sometime in September of 2002, and a third battery that occurred while Petitioner was living in a house on Oak Brook Lane, where he moved in September of 2002 (Ex. Q at 862–920). Each battery was a distinct act—the batteries were not part of the same act or a continuous course of conduct—therefore, there was no double jeopardy issue. *See* United States v. Rice, 43 F.3d 601, 608 (11th Cir. 1995) (the government does not subject a defendant to double jeopardy when it charges him or her with separate acts, even if one act facilitated the next or the acts were part of the same overall transaction); *see also, e.g.*, Wiggins v. McDonough, No. 3:06cv489/LAC/EMT, 2007 WL 4570570, at *8 (N.D. Fla. Dec. 21, 2007) (state court decision denying double jeopardy claim was not contrary to or unreasonable application of clearly established federal law where offenses underlying four charges of lewd or lascivious conduct occurred on four separate occasions between Fall of 2000 and September of 2001, even though victim of each offense was the same, and all offenses occurred in victim's home). Therefore, Attorney Komarek had no meritorious basis to object to the overlapping dates in the amended information on double jeopardy grounds and thus was not ineffective for failing to do so. *See* Brownlee v. Haley, 306 F.3d 1043, 1046 (11th Cir. 2002) (counsel was not ineffective

for failing to raise issues clearly lacking in merit); <u>Chandler v. Moore</u>, 240 F.3d 907, 917–18 (11th Cir. 2001) (rejecting argument for ineffective assistance of counsel where counsel failed to raise a non-meritorious claim); <u>Meeks v. Moore</u>, 216 F.3d 951, 961 (11th Cir. 2000) (counsel not ineffective for failing to make meritless motion for change of venue); <u>Jackson v. Herring</u>, 42 F.3d 1350, 1359 (11th Cir. 1995) (counsel need not pursue constitutional claims which he reasonably believes to be of questionable merit).

Petitioner failed to demonstrate that the state court's adjudication of the claims raised in Ground Five was unreasonable. Therefore, he is not entitled to federal habeas relief.

F. <u>Ground Six: "Ineffective assistance of counsel in that defense counsel failed to properly preserve his jury selection claim of error; alternatively, defense counsel was ineffective for failing to strike a particular juror, all in violation of the Due Process Clause of the Fifth (5th), Sixth (6th), and Fourteenth (14) [sic] Amendments to the U.S. Constitution and Article I, § 16 of the Florida Constitution, but for defense counsel's ineffectiveness, the result of the proceedings would have been different."</u>

Petitioner contends defense counsel was ineffective for failing to renew his objection to the striking of potential juror Peter Custer for cause (doc. 23 at 14–15; doc. 25 at 18–20). Petitioner alleges Mr. Custer was stricken for cause, because he stated he would require physical evidence of sexual battery in order to convict (*id.*). Petitioner acknowledges defense counsel objected to the strike during voir dire, and the court overruled the objection (*id.*). Petitioner alleges defense counsel failed to renew the objection prior to the jury being sworn; therefore, the issue was not preserved for appellate review (*id.*). He contends the issue would have been successful on direct appeal, because the record does not clearly establish that Mr. Custer could not have been fair and impartial (*id.*).

Petitioner additionally contends defense counsel was ineffective for failing to strike Juror John Cantrell (doc. 23 at 14–15; doc. 25 at 18–20). Petitioner alleges Cantrell stated during jury selection that his daughter was the victim of a lewd and lascivious act (*id.*). Petitioner contends defense counsel's failure to strike Cantrell on this ground was unreasonable (*id.*).

Respondent concedes Petitioner raised both claims in Ground 15 of his Rule 3.850 motion (doc. 37 at 11). Respondent contends the state court's adjudication of Petitioner's ineffective assistance of counsel claim was not contrary to or an unreasonable application of clearly established federal law (*id.*).

1. Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground 15 in his amended Rule 3.850 motion (Ex. O at 396–98).  The state circuit court adjudicated the claim as follows:

> In Ground 15, the Defendant alleges trial counsel was ineffective in failing to preserve his jury selection claim of error regarding Juror Peter Custer and for failing to strike Juror John Cantrell.  These claims lack merit.

> During jury selection, over trial counsel's objection, Juror Peter Custer was struck for cause by the Court based on Mr. [C]uster's apparent personal requirement that the State had to introduce physical evidence of the crime.  (JS-82.)  Counsel failed to renew his objection before the jury was sworn, and thus failed to preserve the error for appeal.  *See Ault v. State*, 866 So. 2d 674 (Fla. 2003).  While the Court finds this failure deficient, the Defendant has failed to show it was prejudicial.

> The First District has stated, "the allegation of failing to properly preserve an issue which if well founded would result in a reversal has been held to constitute a preliminary basis for relief . . . ."  *Crumbley v. State*, 661 So. 2d 383, 384–85 (Fla. 1st DCA 1995).  In *Ault*, the Florida Supreme Court observed:

>> The test for determining juror competency is whether a juror can lay aside any bias or prejudice and render a verdict solely on the evidence presented and the instructions on the law given by the court.  A juror must be excused for cause if any reasonable doubt exists as to whether the juror possesses an impartial state of mind.  In reviewing a claim of error such as this, we have recognized that the trial court has a unique vantage point in the determination of juror bias.  The trial court is able to see the jurors' voir dire responses and make observations which simply cannot be discerned from an appellate record.  Thus, a trial court has great discretion when deciding whether a challenge for cause based on juror incompetency is proper.  A trial court's determination of juror competency will not be overturned absent manifest error.

> *Ault*, 866 So. 2d at 683–84 (internal citations and quotations omitted).  Given Mr. [C]uster's personal belief that the State was required to introduce physical evidence of the crime, there existed a reasonable doubt as to whether he possessed an impartial state of mind.  *Id.*  Accordingly, this Court properly struck him for cause.[FN 5] *Moore v. State*, 939 So. 2d 1116, 1118 (Fla. 3d DCA 2006) (affirming trial court's striking juror who stated they could not convict without physical evidence). Therefore, the Defendant has failed to establish there is a reasonable probability that

had counsel preserved his objection, the Defendant would have prevailed on appeal. *See State v. Chattin*, 877 So. 2d 747, 750 (Fla. 2d DCA 2004).

> [FN 5:  Even if the Court did not remove Mr. [C]uster, the State may
> have removed him via one of its remaining peremptory challenges.]

(Ex. V at 1097–98).

The transcript of jury selection shows that although Mr. Custer stated he "absolutely" would follow the law providing that it is illegal for a person eighteen (18) years of age or older to have sexual relations with a child under the age of sixteen (16) (*see* Ex. Y at 58–59), Mr. Custer subsequently stated that even if the law did not require the State to present actual physical evidence of sexual abuse, he would still require such evidence to convict (*id.* at 62–63).

In light of the state court's determination that striking Peter Custer for cause was proper under state law, Petitioner failed to show a reasonable probability of success on appeal had defense counsel properly preserved the issue by renewing his objection to the strike prior to the jury's being sworn. *See* <u>Davis v. Crosby</u>, 341 F.3d 1310, 1315–16 (11th Cir. 2003) (where the failure of counsel was solely in his role as appellate counsel at trial, specifically, objecting during voir dire to a <u>Batson</u> error, but failing to take the necessary step under Florida law of renewing the objection after the conclusion of voir dire, the prejudice inquiry should focus on the effect that counsel's omission at trial had on the appeal).  Therefore, Petitioner failed to demonstrate he was prejudiced by counsel's failure to renew his objection to the State's striking Peter Custer.

Regarding Petitioner's claim that defense counsel was ineffective for failing to strike Juror Cantrell, the state court adjudicated the claim as follows:

> Regarding Juror John Cantrell, the Defendant claims counsel should have struck Mr. Cantrell based on Mr. Cantrell's voir dire testimony that a man exposed himself to his daughter.  During jury selection, Mr. Cantrell stated that a man exposed himself to his daughter and a friend when his daughter was 12.  (JS-23.)  He characterized it as "just an incident" and said, "It wouldn't affect my decision here." (JS-23.)  He acknowledged he could set the incident aside and judge the case based solely on the evidence presented, and he later stated, "I go by the evidence." (JS-35.) Trial counsel indicated that although the incident involving Mr. Cantrell's daughter was a "negative," he gave Mr. Cantrell an overall positive ranking and he was impressed by Mr. Cantrell because he believed Mr. Cantrell "would be a mature and otherwise knowledgeable individual."  (K-32.)  Counsel also believed Mr. Cantrell would be valuable because he "probably also knows how 12-year-old girls can lie

and make stuff up." (K-32.) Additionally, counsel, per his standard practice, consulted with the Defendant prior to making the final jury selection. (K-32, 35; JS-83.) Contrary to the Defendant's assertion that Mr. Komarek failed to act on his request to strike Mr. Cantrell (EH-45-46), counsel testified that if the Defendant wanted him to object to Mr. Cantrell, he would have done so via a peremptory challenge.[FN 6] (K-35-36.) Based on the foregoing, counsel's decision not to strike Mr. Cantrell was a reasonable trial strategy, and thus was not deficient. Furthermore, based on Mr. Cantrell's voir dire testimony, the Defendant has failed to show that counsel's failure to strike Mr. Cantrell resulted in a biased juror serving on the jury, and thus has failed to show prejudice. *See Carratelli v. State*, 961 So. 2d 312, 324 (Fla. 2007) (holding "that where a postconviction motion alleges that trial counsel was ineffective for failing to raise or preserve a cause challenge, the defendant must demonstrate that a juror was actually biased" and that "the evidence of bias must be plain on the face of the record.").

(Ex. Q at 1098–99).

The state court's factual findings are supported by the record. After being informed of the charges Petitioner faced, Juror Cantrell stated he could be fair and impartial (Ex. Y at 5, 11–12, 23). Later, when questioned regarding his daughter's experience, Cantrell stated:

> JUROR CANTRELL: I can be impartial, it just depends on the evidence but my daughter, she was twelve years old, my oldest daughter had, a gentleman exposed himself to her, her and a girlfriend, and he went to jail but that was just an incident. It wouldn't affect my decision here.
>
> MS. ADAMS [the prosecutor]: Okay, so do you feel like you can set that aside and judge this case based on the evidence presented and it alone?
>
> JUROR CANTRELL: Yes.

(*id.* at 23). The prosecutor then questioned potential jurors about their feelings regarding a child's delay in reporting an incident of sexual abuse. Juror Cantrell responded, "I'll try to answer without being biased." (*id.* at 54). The prosecutor told him to state "how you truly feel," and Cantrell responded:

> If it was physical evidence having [sic] intercourse on a twelve-year-old girl by a man, it ain't [sic] her fault. She may think it is, she may have lured, she may have done whatever, but I think the adult's supposed to take responsibility for his actions. Either run, called her parents or whatever the case is. I can't imagine, you know, I've got five daughters and, you know, some are smart, some are doubt, you know some have been in trouble, some haven't but if there was an adult, you know, I don't care what they did, and my daughter's probably guilty of a lot, I mean, they're far from

perfect, but there's a time when the adult takes responsibility for his actions. Show some maturity, wisdom, age, knowledge, whatever. But if there's physical evidence I would have a very hard time finding an excuse. I don't care if it was a month later, a year later, if there was physical evidence.

(Ex. Y at 54–55).

The prosecutor asked the potential juror whether they could imagine a situation where a twelve year old girl may not report sexual abuse because she may have a "crush" or a "love relationship" with an older man, and she does not want him to get in trouble (Ex. Y at 56). The prosecutor asked Juror Cantrell whether he "ha[d] a hard time dealing with that concept" since he had several daughters (*id.*). The following exchange occurred:

> JUROR CANTRELL: I have a hard time being biased just based on if there's physical evidence. I don't care if it's months, I just—

> MS. ADAMS: What if there's no physical evidence?

> JUROR CANTRELL: Just he said, she said?

> MS. ADAMS: And other things, right.

> JUROR CANTRELL: If it was just he said, she said, then just see the way the testimony—

> MS. ADAMS: Okay.

> JUROR CANTRELL: —but if you have some type of physical evidence I don't know of an excuse.

(Ex. Y at 56).

Attorney Komarek stated in his deposition that during voir dire, he noted that Mr. Cantrell's twelve-year-old daughter was the victim of an indecent exposure (Ex. Q at 846). Komarek stated he did not strike Mr. Cantrell because (1) Cantrell impressed him as being a mature and knowledgeable person, (2) Cantrell said he could be fair when he was questioned on that point, and (3) having five daughters, Cantrell probably knew that 12-year-old girls can lie and fabricate things (*id.*). Komarek testified he made a negative notation on his juror seating chart for what Cantrell said about the incident involving his daughter, but Komarek ranked Cantrell positively overall (*id.*).

The state court's denial of this claim was not unreasonable. Juror Cantrell candidly admitted he would be biased against a defendant in a case where there was physical evidence of sexual abuse, but in Petitioner's case there was no physical evidence that Petitioner committed the offenses. Further, Cantrell stated that in a case where there was no physical evidence, he would base his decision on the testimony presented at trial. Additionally, the incident of the man's exposing himself to Cantrell's daughter occurred more than seven (7) years prior to Petitioner's trial, and the man was punished for his conduct.[5] Juror Cantrell stated he could set aside that incident and judge Petitioner's case based solely on the evidence presented. Petitioner failed to show that Cantrell was actually biased and that no competent counsel would have failed to strike him. Therefore, Petitioner failed to establish that defense counsel's failure to do so was unreasonable. *See, e.g.*, Bell v. United States, 351 F. App'x 357, 359–60 (11th Cir. 2009) (unpublished) (trial counsel was not ineffective for failing to move the court to strike a juror for cause, exercise a peremptory strike, or at least revisit her indication of possible impartiality in defendant's trial for drug-related charges; although juror first indicated during individual questioning that she was not sure she could presume a defendant's innocence if the offense involved drugs and the court brought up the juror as a possible for cause challenge, subsequent to her initial expression of uncertainty, multiple other questions and answers during voir dire, plus the court's instructions to the venire, established that the juror could be impartial, and the record showed that trial counsel made an express decision to accept the juror); Hunter v. Sec'y for Dep't of Corr., 318 F. App'x 856, 858–59 (11th Cir. 2009) (unpublished) (habeas petitioner failed to establish that defense counsel's failure to strike juror, who responded "I think so" when asked whether she would be able to follow the court's instructions during trial, and stated she would "try" to follow the law as instructed, was unreasonable, where juror subsequently affirmed she could follow the judge's instructions; she exhibited no bias against petitioner; and she expressed that she was capable of applying the law as instructed by the court); Babb v. Crosby, 197 F. App'x 885, 887 (11th Cir. 2006) (unpublished) (habeas petitioner failed to establish that defense counsel's failure to strike juror, who indicated that eight years earlier, she or someone close to her had experienced sexual and physical

---

[5] Mr. Cantrell stated that this incident involved his oldest daughter, who was twelve (12) years old at the time of the incident (Ex. Y at 23). He stated he had seven (7) children, five (5) of whom were girls, and the youngest of them was a son who was nineteen (19) years old at the time of jury selection (*id.* at 10–11, 33).

abuse and that she might not be able to be fair and impartial in petitioner's trial for sexual battery and lewd or lascivious assault upon a child, was an act that no competent counsel would have taken, where counsel testified (1) he wanted a jury with many independent thinkers, (2) he considered juror's previous service on a hung jury to be significant, and (3) although he noted on his voir dire seating chart that juror was a victim, given the general jury pool in petitioner's case, juror may have fallen within the acceptable range).[6]

Petitioner failed to demonstrate that the state court's adjudication of the claims raised in Ground Six was unreasonable. Therefore, he is not entitled to federal habeas relief.

G.    Ground Seven: "Petitioner alleges the overall effects of cumulative error, all in violation of the Due Process Clause of the Fifth (5th), Sixth (6th), and Fourteenth (14) [sic] Amendments to the U.S. Constitution and Article I, § 16 of the Florida Constitution, but for defense counsel's ineffectiveness, the result of the proceedings would have been different."

Petitioner contends he is entitled to a new trial in light of the cumulative effect of counsel's errors (doc. 23 at 15–16; doc. 25 at 20–21).

Respondent contends there was no deficient performance by Petitioner's defense counsel, and no prejudice from any such performance; therefore, there is nothing to accumulate into a separate claim of ineffectiveness (doc. 37 at 14–18). Respondent additionally contends the Supreme Court has not recognized a claim of cumulative error by a state habeas petitioner; therefore, there is no "clearly established federal law" for purposes of § 2254(d) (*id.* at 17–18).

The Supreme Court has not recognized the cumulative error doctrine in the context of ineffective assistance of counsel claims.[7] Although the Eleventh Circuit has noted, on direct appeal of a federal conviction, that the cumulative effect of several errors that are harmless by themselves

---

[6] The undersigned cites unpublished Eleventh Circuit cases only as persuasive authority and recognizes that the opinion is not considered binding precedent. *See* 11th Cir. R. 36-2.

[7] The Eleventh Circuit has noted "the absence of Supreme Court precedent applying cumulative error doctrine to claims of ineffective assistance of counsel." Forrest v. Fla. Dep't of Corr., 2009 WL 2568185, at *4 (11th Cir. Aug. 21, 2009) (unpublished). The court cautioned that the Supreme Court has held that "there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *Id.* at 5 (quoting United States v. Cronic, 466 U.S. 648, 659 n.26, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984)).

could so prejudice the defendant's right to a fair trial that a new trial may be necessary,[8] the Eleventh Circuit has never expressly recognized a freestanding "cumulative effect" claim, based upon the assertion that alleged errors of the trial court, defense counsel, or the State, or a combination thereof, rendered the trial fundamentally unfair even though such errors were individually harmless or non-prejudicial, as cognizable under § 2254.  *See, e.g.,* Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1132 (11th Cir. 2012) (refusing to decide whether, under the current state of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA can ever succeed in showing that the state court's decision on the merits was contrary to or an unreasonable application of clearly established law); Conklin v. Schofield, 366 F.3d 1191, 1210 (11th Cir. 2004) (applying pre-AEDPA standard of review and denying claim that trial court errors and conduct of trial counsel combined to rob petitioner of fair trial and sentencing, but not relying upon Supreme Court precedent for its decision); Sims v. Singletary, 155 F.3d 1297 (11th Cir. 1998) (applying pre-AEDPA standard of review and holding that district court erred in finding that cumulative guilt stage errors prejudiced petitioner during penalty phase); Cargill v. Turpin, 120 F.3d 1366, 1386 (11th Cir. 1997) (applying pre-AEDPA standard of review and declining petitioner's invitation to entertain "cumulative error" claim because petitioner's trial was not fundamentally unfair); Dobbs v. Kemp, 790 F.2d 1400, 1505 (11th Cir. 1986) (applying pre-AEDPA standard of review and denying petitioner's claim that improper prosecutorial argument and evidentiary errors rendered trial fundamentally unfair and citing Donnelly v. DeChristoforo, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1973)); Bronstein v. Wainwright, 646 F.2d 1048, 1056 (5th Cir. 1981) (same).[9]

---

[8] *See* United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005) ("The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal.") (internal quotations and citations omitted);  United States v. Ramirez, 426 F.3d 1344, 1353 (11th Cir. 2005) ("[T]he 'cumulative effect' of multiple errors may so prejudice a defendant's right to a fair trial that a new trial is required, even if the errors considered individually are non-reversible.") (quoting United States v. Thomas, 62 F.3d 1332, 1343 (11th Cir. 1995)); United States v. Adams, 74 F.3d 1093, 1099–1100 (11th Cir. 1996) (citing United States v. Preciado-Cordobas, 981 F.2d 1206, 1215 n.8 (11th Cir. 1993)).

[9] The law of the other circuit courts of appeals is mixed on the issue of whether a claim of "cumulative effect" or "cumulative error" is cognizable on federal habeas.  The Fourth, Sixth and Eighth Circuits do not recognize cumulative error claims on federal habeas.  *See* Williams v. Anderson, 460 F.3d 789, 816 (6th Cir. 2006) (claims of cumulative error are not cognizable on federal habeas because the Supreme Court has not spoken on this issue); Fisher v. Angelone, 163 F.3d 835, 852–53 (4th Cir. 1998) (ineffective assistance of counsel claims, like claims of trial court

In any event, cumulative error analysis should evaluate only matters determined to be in error, not the cumulative effect of non-errors. *See* United States v. Waldon, 363 F.3d 1103, 1110 (11th Cir. 2004) (where no individual errors have been demonstrated, no cumulative errors can exist); United States v. Barshov, 733 F.2d 842, 852 (11th Cir. 1984) ("Without harmful errors, there can be no cumulative effect compelling reversal."); Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir. 1987) ("Mullen cites no authority in support of his assertion, which, if adopted, would encourage habeas petitioners to multiply claims endlessly in the hope that, by advancing a sufficient number of claims, they could obtain relief even if none of these had any merit. We receive enough meritless habeas claims as it is; we decline to adopt a rule that would have the effect of soliciting more and has nothing else to recommend it. Twenty times zero equals zero."); *see also* United States v. Hall, 455 F.3d 508, 520 (5th Cir. 2006); Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) (where there is no single constitutional error, nothing can accumulate to the level of a constitutional violation); United States v. Hardy, 224 F.3d 752, 757 (8th Cir. 2000); Angelone, *supra*; Moore v. Reynolds, 153 F.3d 1086, 1113 (10th Cir. 1998); United States v. Rivera, 900 F.2d 1462, 1471 (10th Cir. 1990) ("[A] cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors."). Thus, Petitioner must show error with respect to at least two of his individual claims.

As previously discussed, Petitioner has not shown an error of constitutional dimension with respect to any of his federal habeas claims. Therefore, he cannot show that the cumulative effect of the alleged errors deprived him of a fundamentally fair trial.

## V.   CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant,"

---

error, must be reviewed individually, rather than collectively); Wainwright v. Lockhart, 80 F.3d 1226, 1233 (8th Cir. 1996) ("Neither cumulative effect of trial errors nor cumulative effect of attorney errors are grounds for habeas relief."). The Ninth Circuit recognizes cumulative error claims and expressly recognized Chambers v. Mississippi, 410 U.S. 284 (1973) as the clearly established federal law governing such claims. *See* Parle v. Runnels, 505 F.3d 922, 928–29 (9th Cir. 2007). The Tenth Circuit recognizes cumulative error claims and recognized Brecht v. Abrahamson, 507 U.S. 619 (1993) as the clearly established federal law on this issue. *See* Darks v. Mullin, 327 F.3d 1001, 1018 (10th Cir. 2003). The Second and Seventh Circuits recognize cumulative effect analysis of individual claims of ineffective assistance of counsel in applying the prejudice prong of Strickland. *See* Williams v. Washington, 59 F.3d 673, 682–84 (7th Cir. 1995); Rodriguez v. Hoke, 928 F.2d 534 (2d Cir. 1991).

and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.     That the second amended petition for writ of habeas corpus (doc. 23) be **DENIED**.

2.     That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 23rd day of July 2013.


/s/ Elizabeth M. Timothy
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**